1

2

3                                                                  O

4

5

6

7

8

9

10

11                    UNITED STATES DISTRICT COURT

12                    CENTRAL DISTRICT OF CALIFORNIA

13

14   DYLAN RIDGEL,            )   Case No.
                              )   SACV 12-0071 JGB (MLGx)
15              Plaintiff,    )
                              )
16        v.                  )   **ORDER DENYING DEFENDANT'S**
                              )   **MOTION FOR SUMMARY JUDGMENT**
17   UNITED STATES OF         )   **(DOC. NO. 27)**
     AMERICA,                 )
18                            )
                Defendant.    )
19   _____)

20

21

22

23        Before the Court is a Motion for Summary Judgment

24   filed by Defendant United States of America.  After

25   considering the papers filed in support of and in

26   opposition to the Motion, and the arguments advanced by

27   counsel at the May 20, 2013 hearing, the Court DENIES

28   Defendant's Motion for Summary Judgment.

# I.   BACKGROUND

## A.   Procedural Background

On January 17, 2012, Plaintiff Dylan Ridgel ("Ridgel") filed his Complaint against the United States of America ("the Government") alleging negligence under a premises liability theory pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80.  (Compl. at 1 (Doc. No. 1).)

On April 22, 2013, the Government filed this Motion for Summary Judgment ("MSJ") along with:

1.   Statement of Undisputed Facts ("SUF");

2.   Declaration of W. Thomas Hendon, attaching four exhibits;

3.   Declaration of Alberto Salazar;

4.   Declaration of Archie Sanchez, attaching one exhibit; and

5.   Expert report prepared by Charles Miller of construction consultants Bert L. Howe & Associates.

(Doc. Nos. 27 through Doc. No. 27-10.)

On April 29, 2013, Ridgel filed his Opposition, along with:

1.  Statement of Genuine Issues of Material Fact ("SGI") (Doc. No. 28-1 at 1-29);

2.  Statement of Additional Undisputed Facts ("SAUF") (id. at 30-39);

3.  Objections to the Government's Evidence ("Objections");

4.  Declaration of Kenneth G. Ruttenberg, attaching nine exhibits;

5.  Declaration of Dylan Ridgel, attaching three exhibits;

6.  Declaration of Daniel S. Daderian, attaching two exhibits; and

7.  Declaration of David E. Kalb, attaching three exhibits.

(Doc. Nos. 28 through 28-23.)

Finally, the Government filed its Reply on May 10, 2013, along with two exhibits consisting of deposition excerpts.  (Doc. Nos. 33 through 33-2.)

## II.   LEGAL STANDARD

A court shall grant a motion for summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

1  of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty</u>
2  <u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The moving
3  party must show that "under the governing law, there can
4  be but one reasonable conclusion as to the verdict."
5  <u>Anderson</u>, 477 U.S. at 250.

6

7      Generally, the burden is on the moving party to
8  demonstrate that it is entitled to summary judgment.  <u>See</u>
9  <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998)
10 (citing <u>Anderson</u>, 477 U.S. at 256-57); <u>Retail Clerks</u>
11 <u>Union Local 648 v. Hub Pharmacy, Inc.</u>, 707 F.2d 1030,
12 1033 (9th Cir. 1983).  The moving party bears the initial
13 burden of identifying the elements of the claim or
14 defense and evidence that it believes demonstrates the
15 absence of an issue of material fact.  <u>Celotex Corp. v.</u>
16 <u>Catrett</u>, 477 U.S. 317, 323 (1986).  Because summary
17 judgment is a "drastic device" that cuts off a party's
18 right to present its case to a jury, the moving party
19 bears a "heavy burden" of demonstrating the absence of
20 any genuine issue of material fact.  <u>See Avalos v. Baca</u>,
21 No. 05-CV-07602-DDP, 2006 WL 2294878 (C.D. Cal. Aug. 7,
22 2006) (quoting <u>Nationwide Life Ins. Co. v. Bankers</u>
23 <u>Leasing Ass'n, Inc.</u>, 182 F.3d 157, 160 (2d Cir. 1999)).

24

25     Where the non-moving party has the burden at trial,
26 however, the moving party need not produce evidence
27 negating or disproving every essential element of the
28

1    non-moving party's case.  Celotex, 477 U.S. at 325.

2    Instead, the moving party's burden is met by pointing out

3    that there is an absence of evidence supporting the non-

4    moving party's case.  Id.; Horphag Research Ltd. v.

5    Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007).  "[A]

6    summary judgment motion may properly be made in reliance

7    solely on the 'pleadings, depositions, answers to

8    interrogatories, and admissions on file.'"  Celotex, 477

9    U.S. at 324 (quoting Fed. R. Civ. P. 56(c)).

10

11       The burden then shifts to the non-moving party to

12   show that there is a genuine issue of material fact that

13   must be resolved at trial.  Fed. R. Civ. P. 56(c);

14   Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256.  The

15   non-moving party must make an affirmative showing on all

16   matters placed in issue by the motion as to which it has

17   the burden of proof at trial.  Celotex, 477 U.S. at 322;

18   Anderson, 477 U.S. at 252.  See also William W.

19   Schwarzer, A. Wallace Tashima & James M. Wagstaffe,

20   Federal Civil Procedure Before Trial § 14:144.  A genuine

21   issue of material fact will exist "if the evidence is

22   such that a reasonable jury could return a verdict for

23   the non-moving party."  Anderson, 477 U.S. at 248.

24

25       In ruling on a motion for summary judgment, a court

26   construes the evidence in the light most favorable to the

27   non-moving party.  Scott v. Harris, 550 U.S. 372, 378,

28

                              5

380 (2007); <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991); <u>T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III. FACTS

**A. Evidentiary Issues**

Ridgel objects to (1) the Expert Report of Charles Miller ("Miller Report") as inadmissible evidence (Objections ¶¶ 4, 5); (2) several declaration statements as improper opinion under Federal Rule of Evidence ("FRE") 701 (<u>id.</u> ¶¶ 16, 18, 34, 36, 37); and (3) various other factual contentions and declaration statements as legal conclusions, irrelevant, lacking foundation, or speculative (<u>see generally</u> Objections).

**1. Miller Report**

The Court sustains Ridgel's objection to the Miller Report and thus strikes it as inadmissible evidence. First, the Report is not attached to any declaration and is unauthenticated and unsworn. <u>See</u> <u>Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764, 773-75 (9th Cir. 2002) (finding exhibits improperly authenticated and thus inadmissible and stating that "[a] trial court can only consider admissible evidence in ruling on a motion for summary

judgment").  Courts in the Ninth Circuit "have routinely held that unsworn expert reports are inadmissible." Harris v. Extendicare Homes, Inc., 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011); see also Shuffle Master, Inc. v. MP Games LLC, 553 F. Supp. 2d 1202, 1210-11 (D. Nev. 2008); King Tuna, Inc. v. Anova Food, Inc., No. 07-7451-ODW, 2009 WL 650732, at *1 (C.D. Cal. Mar. 10, 2009) (stating that "[i]t is well-settled that under Fed.R.Civ.P. 56(e), unsworn expert reports are not admissible to support or oppose summary judgment" and that "to be competent summary judgment evidence, an expert report must be sworn to or otherwise verified, usually by a deposition or affidavit").

Second, the Government failed to attach or otherwise provide the documents on which Miller relied in drafting his report.  See FRCP 56(c); Harris, 829 F. Supp. 2d at 1027 ("The [expert] reports are also inadmissible because they fail to attach copies of the documents to which they refer. . . . The Court will not simply assume that the experts have accurately quoted or characterized those documents.")  Even if the Court overlooks that images of multiple documents referenced are embedded in the Report, rather than being attached and authenticated as exhibits, the Government still fails to attach the four depositions and the response to interrogatories that Miller must have relied on to write his factual statement and from which

1  he drew his conclusions.[1]  (See Miller Rep. at 32

2  (Documents Reviewed Nos. 8-12), 43-45.)

3

4      The Court therefore finds the Miller Report

5  inadmissible and does not consider it here.

6

7      **2.   Improper Opinion**

8

9      The Court overrules Ridgel's objections based on FRE

10  701, which states that non-expert witnesses are limited

11  to offering opinions that are (1) "rationally based on

12  the witness's perception"; (2) "helpful . . . to

13  determining a fact in issue; and (3) "not based on . . .

14  specialized knowledge" that is within the scope of expert

15  witness testimony.  (Objections ¶¶ 16, 18, 34, 36, 37.)

16  The underlying evidence in the objected-to portions of

17  the SUF consists of sworn statements from Alberto Salazar

18  (Pipe Shop Supervisor), W. Thomas Hendon (Maintenance

19  Team Supervisor), and Archie Sanchez (Occupational Health

20  and Safety Specialist).  All three were employed in these

21  capacities by the Department of Veteran Affairs in Long

22  Beach, California, the site of Ridgel's injury, and their

23

24      [1] The only citation Miller provides for his
recitation of the facts regarding Ridgel's injury is the

25  single-paragraph, undated "Report of Contact Regarding
Dylan Ridgel's Injury on 3/23/11," which is signed by

26  Alberto Salazar.  (See Miller Rep. at 44, 45.)  Miller
primarily states facts that are not listed in this Report

27  of Contact, and no other items listed in the Report's
"Documents Reviewed" section could provide facts as to

28  Ridgel's injury and the events preceding it.  (See id. at
32, 43-45.)

testimony is properly based on personal knowledge and the
conclusions they drew as part of their job
responsibilities.  (See Salazar Decl. ¶ 1; Hendon Decl. ¶
1; Sanchez Decl. ¶ 1.)  Statements such as Salazar's
regarding the purpose and functioning of pipe at issue
(Objections ¶¶ 16, 18) are properly interpreted as
statements of his knowledge and belief developed in the
course of his daily duties, which is material to Ridgel's
negligence claim, rather than as expert testimony that
goes primarily to the truth of the statement.  Thus, the
nature of Ridgel's objection is more appropriately
considered in the determination of whether the Government
has established the facts submitted in its SUF, not as a
question of admissibility of the evidence.

### 3.  Remaining Objections

The majority of Ridgel's remaining objections are
either not properly grounded in evidentiary rules or are
duplicative of the summary judgment standard, requiring
consideration of material facts only, and thus
unnecessary to resolve here.  Regarding Ridgel's many
objections under FRE 602, which requires that witnesses
have personal knowledge of the matter about which they
are testifying, the Court finds that there is clearly
sufficient foundation for all except two of the of the

objected-to declaration statements, which are considered below.

First, Ridgel objects to the following sentence from Paragraph 7 of the Salazar Declaration (Objection ¶ 22): "After Mr. Ridgel and I walked through the door leading to the third floor roof, I took Mr. Ridgel far enough away from the door so he and I could see the top of the hot steam vent pipe that was still regularly emitting scalding condensate on the fourth floor roof." The Court construes this sentence as a statement that Salazar could see the top of the pipe and that Salazar believed Ridgel could see it too. The language "hot steam vent pipe" and "regularly emitting scalding condensate" refers only to Salazar's personal knowledge; the Court does not interpret the language to state that Ridgel had this knowledge as well. Thus construed, the Court overrules Ridgel's objection.

Second, Ridgel objects to Paragraph 6 of the Sanchez Declaration. (Objections ¶¶ 30-33.) Sanchez declares that, "[b]ased on what I learned about the work that Mr. Ridgel performed on May 23, 2011, it appears that Mr. Ridgel did not take adequate basic safety precautions." (Sanchez Decl. ¶ 6.) Sanchez then cites the following three examples of Ridgel's unsafe actions or inactions: (1) Ridgel did not use "fall protection"; (2) Ridgel

touched the pipe to determine its temperature; and (3)
Ridgel "made no effort to inform any" supervisors or
safety office employees before he went on to the roof
where he suffered his injury.  (Id. ¶¶ 6(a)-(c).)  The
Court sustains Ridgel's objections.  Sanchez does not
claim to have personal knowledge of and offers no
foundation for these statements, which are the sole
evidentiary basis for the Government's submitted facts
regarding Ridgel's alleged lack of safety precautions.
(See SUF ¶¶ 30-33.)  As such, Sanchez's statement that it
"appears that Mr. Ridgel did not take adequate basic
safety precautions" is not based on personal knowledge.
For such an opinion to be relevant, it would have to be
based on specialized knowledge and satisfy the
requirements for expert witnesses under FRE 702.  The
Court therefore sustains Ridgel's objection and does not
consider Paragraph 6 of the Sanchez Declaration.

**B.  Undisputed Facts**

    The following material facts are supported adequately
by admissible evidence and are uncontroverted.  They are
"admitted to exist without controversy" for purposes of
the MSJ.  Local R. 56-3 (stating that facts not
"controverted by declaration or other written evidence"
are assumed to exist without controversy); Fed. R. Civ.
P. 56(e)(2) (stating that where a party fails to address

another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").

Dylan Ridgel, doing business as Precision Firestop Contracting, was an independent contractor who had been hired on multiple occasions for discrete jobs at the Department of Veteran Affairs, Long Beach Medical Center in Long Beach, California ("VA"), including sealing water pipes and patching leaks for W. Thomas Hendon, the VA Maintenance Team Supervisor. (SUF ¶¶ 1, 2; SGI ¶¶ 1, 2; Hendon Decl. ¶ 2.) Ridgel also performed work at the VA for a different VA contractor and, prior to that, had done roof repairs at the VA with his father. (Hendon Decl. ¶ 2.) Ridgel's work at the VA also included installing synthetic caulking around pipes and ducts. (SGI ¶ 1; Ridgel Decl. ¶ 3.)

In early March 2011, Hendon requested that Ridgel perform water sealant work at several locations at the VA. (SUF ¶ 9; SGI ¶ 9.) On March 4, 2011, Ridgel faxed Hendon a work proposal listing the services to be performed and the proposed price. (Hendon Decl., Ex. 1; Ridgel Decl. ¶ 4.) After Hendon contacted Ridgel, VA personnel observed a water leak in the medical center and reported it to Alberto Salazar, the VA's Pipe Shop Supervisor, who investigated the leak and traced it up to

the fourth floor roof of building 126.  (SUF ¶¶ 10, 11;
SGI ¶¶ 10, 11.)  Salazar went to the third floor roof and
"observed [on the fourth floor roof] a hot steam vent
pipe that was emitting steam and liquid" that Salazar
"believed to be 190 degree condensate."  (SUF ¶ 12; SGI ¶
12.)  According to Salazar, he "observed the vent pipe
was having . . . almost like a volcanic effect, where
water was gushing out every so often . . .[,] meaning
like every minute or two."  (SAUF ¶ 5; Ruttenberg Decl.,
Ex. D (Deposition of Alberto Salazar ("Salazar Dep.")) at
35:4-7.)  Salazar "believed that the scalding condensate
was probably eating away at the protective sealant on the
roof at the base of the pipe, resulting in a leak of
water into the walls."  (Salazar Decl. ¶ 2; SUF ¶ 13; SGI
¶ 13.)  Salazar then traced the fourth-floor pipe to the
mechanical room in the basement, where he "discovered
that a 'liquid mover' may have been malfunctioning,"
causing condensate water to back up and vent out of the
pipe.  (SUF ¶ 14; SGI ¶ 14; Salazar Decl. ¶ 3.)  Salazar
suspected the cause to be a malfunctioning liquid mover
or regulator based in part on his "general experience at
the VA[, where] [t]hat is a very common incident."  (SAUF
¶¶ 6, 8; Salazar Dep. At 35:13-25.)  After Salazar
investigated the leak and observed the fourth-floor pipe
emitting liquid, he told Hendon that the roof leak needed
to be fixed and notified Jorge Guzman, the boiler plant
supervisor, that the liquid mover may have been

malfunctioning.  (SUF ¶¶ 15, 19; SGI ¶¶ 15, 19.)  Salazar
did not tell anyone that the liquid mover should be
repaired before the roof leak was fixed and did not tell
Hendon anything about the liquid mover.  (SAUF ¶ 14, 15.)
Salazar does not believe he ever showed Hendon the water
emitting from the pipe and does not recall ever telling
Hendon about the water emitting from the pipe.  (SAUF ¶¶
11, 12.)

   Within "a few days" of Salazar informing Hendon about
the leak, Ridgel came to the VA to see the site of the
proposed job and to have Salazar explain the work that
needed to be performed.  (SUF ¶¶ 20, 21; SGI ¶¶ 20, 21.)
After meeting Ridgel in the hallway on the third floor,
Salazar led Ridgel through a locked doorway onto the
third-floor roof, from where the pipe on the fourth-floor
roof was visible, and pointed out the fourth-floor roof
as the possible source of the leak and the proposed work
site. (SUF ¶¶ 21, 22; SGI ¶¶ 21, 22; SAUF ¶¶ 18-20.)
Salazar did not tell Ridgel that he thought the liquid
mover was malfunctioning.  (SAUF ¶ 31.)  After meeting
with Salazar, Ridgel, per Hendon's request, revised his
work proposal and added the line, "Buildin[g] 126, Hot
vent pipe 3rd floor roof."  (SAUF ¶ 38; Hendon Decl, Ex.
2.)

14

On March 11, 2011, the VA processed and approved a Credit Card Worksheet requested by Hendon, which authorized payment of $2,380 to Ridgel and required him "[t]o repair rain leaks from roofs due to penetrations in BLDG's 5, 126, and 1." (SAUF ¶ 44; Ruttenberg Decl., Ex. A (March 11, 2011 Credit Card Worksheet).)  There is no other text regarding the nature or scope of the required work on the Credit Card Worksheet.

On March 23, 2011, Ridgel went to the VA to perform the request work. (Ridgel Decl. 19.)  Ridgel, without telling Hendon or Salazar, accessed the third-floor roof with the help of two VA employees, including Walter Schmidt, a member of the VA's engineering staff who was supervised by Hendon.  (SUF ¶ 28; SGI ¶ 28; SAUF ¶¶ 66-77.)  Neither Hendon nor Salazar had told Ridgel that he was authorized to access the fourth-floor roof without first telling them.  (SUF ¶ 29; SGI ¶ 29.)  Ridgel accessed the fourth-floor roof without first telling Hendon or Salazar.  (SUF ¶ 33; SGI ¶ 33.)  Once on the fourth-floor roof, Ridgel applied synthetic caulking around the vent pipe penetration.  (SUF ¶ 37; SGI ¶ 37.) He did not see any steam or water emitting from the pipe, until, while kneeling down to spread the caulk, the vent emitted scalding water, inflicting burns on Ridgel's back, arms, shoulders, back of neck, right foot, ears,

1  forehead, lower-right side of abdomen, and buttocks.
2  (SAUF ¶¶ 80, 88.)

3

4      Within 10 days of Ridgel's injury, the site of the
5  injury was inspected separately by Olivia Parducho (the
6  VA's Safety and Occupational Health Manager and Sanchez's
7  supervisor), James M. Bachman (a Certified Safety
8  Professional), and Brian Pepi Woods (the VA's Maintenance
9  Control Manager and Hendon and Salazar's supervisor).
10  (SAUF ¶¶ 93, 95, 97; Ruttenberg Decl, Exs. G, H, E.)
11  Neither Parducho, Bachman, nor Woods saw the vent pipe
12  emit water during their inspections; Parducho saw
13  "nothing out of the ordinary" about the pipe or roof.
14  (SAUF ¶¶ 94, 96, 97.)

15

16      One month after Ridgel's injury, Guzman requested a
17  Credit Card Worksheet to authorize payment to a vendor
18  for "New Complete Pump head assembly with valves for
19  Condensate Return Pump Station in Building 126.  Existing
20  Pump station is damaged and not working properly . . . .
21  Unit is causing condensate to back-up and water to shoot
22  out from the bent line on roof.  Making this a Safety
23  Issue."  (SAUF ¶ 98; Ruttenberg Decl., Ex. F (April 22,
24  2011 Credit Card Worksheet).)

25

26      At the time of his injury, Ridgel was a Class C-61
27  limited specialty contractor, with a D-12 subcategory
28

16

classification (as defined by the California Contractors State License Board) of Synthetic Products Contractor; he was not a C-39 roofing contractor.  (SUF ¶¶ 3, 5; SGI ¶¶ 3, 5.)

**C.  Controverted Facts**

  The following material facts submitted by the Government are sufficiently controverted by Ridgel's evidence such that there exists a genuine dispute.  <u>See</u> Local R. 56-3; FRCP 56(c).

   First, there are genuine disputes as to most of the submitted facts regarding Ridgel's meeting and conversation with Salazar.  The parties dispute what Salazar told Ridgel and the specificity with which Salazar pointed out the "proposed work site," that is, the vent pipe.  (<u>See</u> SUF ¶ 23; SGI ¶ 23; SAUF ¶¶ 16-21.) The parties dispute whether Salazar told Ridgel that the pipe was a "steam pipe" and, if he did not, whether Ridgel knew it was a steam pipe.  (<u>See</u> SUF ¶ 23; SGI ¶ 23; SAUF ¶ 81.)  Further, according to Ridgel, when he met with Salazar, Salazar told him that he did not know where the leak was coming from, but that it could be coming from the fourth floor roof through a pipe or drain or could be the result of rain water or condensation build-up outside a vent pipe.  (SAUF ¶ 16; Ridgel Decl. ¶

6.)  While this does not directly controvert the
Government's assertion that Salazar told Ridgel he
"believed that the scalding condensate was deteriorating
the penetration around the hot steam vent pipe, resulting
in water leaks into the building" (SUF ¶ 23), it does
raise the material fact question of what Salazar told
Ridgel in total and what Ridgel would have reasonably
interpreted from the combined statements.

More directly, Ridgel controverts the Government's
assertions that Salazar instructed Ridgel to notify him
or Hendon before he went up to the roof to fix the leak.
(SUF ¶ 24; SGI ¶ 24; SAUF ¶¶ 25-28.)  In addition to
declaring he never received such instruction from
Salazar, Ridgel submits evidence that (1) he was never
required to seek approval before accessing the roof or,
absent written instructions, before beginning his work
during his multiple previous jobs at the VA (SAUF ¶¶ 52,
54); (2) he never received any written instructions to
notify an employee before beginning his work or regarding
any safety issue (id. ¶ 56); and (3) Hendon, Ridgel's
primary contact at the VA for this job, declares that he
never asked Ridgel to notify him before beginning work
(id. ¶¶ 57-60).[2]

---

[2] In Paragraphs 25-27 of the SUF, the Government
again asserts that Salazar instructed Ridgel to notify
him or Hendon before beginning work, but also indicates
that Salazar provided Ridgel with three specific
rationales for this request; that is, Salazar gave Ridgel
(continued...)

Second, the Government submits the fact that Ridgel
accessed the third-floor roof without contacting Hendon,
Salazar, "or any employees from the Long Beach VA Safety
Office." (SUF ¶ 28.) Ridgel does not controvert this
fact, but the submitted fact gives rise to further issues
of material fact, as Ridgel did notify and was granted
access to the third-floor roof by Walter Schmidt, a
member of the VA's engineering staff who reported to
Hendon. (SGI ¶ 28; SAUF ¶¶ 65-71.) Sanchez, a Safety
Specialist at the VA, testified that when Ridgel asked
Schmidt to unlock the door for him to the third-floor
roof, Schmidt "should have probably notified the safety
office" and that, at "safety meetings," Schmidt and
others were likely "told . . . to make sure that they . .
. call the safety office before . . . any contractors go
up on the roof." (SAUF ¶¶ 72, 73; Ruttenberg Decl., Ex.
C ("Sanchez Dep.") at 34:25-35:18; 36:4-16.)

Third, the Government asserts that, had Ridgel
informed Salazar or Hendon prior to beginning his work,

<hr/>

[2](...continued)
the notification instructions "so either Mr. Hendon or
Mr. Salazar could provide Plaintiff access through the
locked door" (SUF ¶ 25); "to determine how Plaintiff
could actually reach the fourth floor roof" (id. ¶ 26);
and "so the VA could take steps to ensure" Ridgel's
safety (id. ¶ 27). As the Government has not submitted
evidence to establish that Salazar stated these reasons
to Ridgel, as opposed to just having thought them, these
submitted facts are immaterial. (See Salazar Decl. ¶ 8
("I gave Mr. Ridgel these instructions for three reasons:
. . . .").)

they would have taken certain precautions that could have prevented Ridgel's injury.  (See SUF ¶¶ 34-36.)  While such asserted facts are hypothetical and thus difficult to establish, the most salient of the assertions, that notifying the appropriate people would have lead them to divert the flow of potential condensate away from the steam pipe, is controverted by Ridgel's evidence.  (Id. ¶ 36.)  Salazar, who allegedly gave Ridgel these instructions, had never operated the boiler system, which includes the liquid mover, and did not know how to operate it, and Salazar had not told Hendon about the potentially malfunctioning liquid mover.  (SGI ¶ 36; SAUF ¶ 11, 12, 14, 15, 61.)  Thus, there is a material issue of fact as to what role, if any, notifying Salazar or Hendon would have had with to Ridgel's injury.

## IV. DISCUSSION

**A.  Substantive Law for Independent Contractors and Negligence Claims**

In California, "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury

upon himself or herself."  Cal. Civ. Code § 1714.  "The
threshold element of a cause of action for negligence is
the existence of a duty to use due care toward an
interest of another that enjoys legal protection against
unintentional invasion."  Bily v. Arthur Young & Co., 3
Cal. 4th 370, 397 (1992).  Nevertheless, where the
injured party is an independent contractor or employee of
an independent contractor, under California law, the
injured contractor generally "cannot sue the party that
hired the contractor to do the work."  SeaBright Ins. Co.
v. US Airways, Inc., 52 Cal. 4th 590, 594 (2011).  This
rule, established in Privette v. Superior Court 5 Cal.
4th 689 (1993), is subject to limited exceptions.  See
id.; Kinsman v. Unocal Corp., 37 Cal. 4th 659, 680
(2005).  The exception to the Privette rule upon which
Ridgel relies, a claim of premises liability, holds that
a "hirer as landowner may be independently liable to the
contractor's employee . . . if (1) [the hiring landowner]
knows or reasonably should know of a concealed, pre-
existing hazardous condition on its premises; (2) the
contractor does not know and could not reasonably
ascertain the condition; and (3) the landowner fails to
warn the contractor."  Kinsman, 37 Cal. 4th at 675.

    This exception, however, is subject to its own
limitations.  The hirer is not liable, for example, where
the contractor creates the hazard or where the hazard is

1   apparent and the contractor fails to take appropriate

2   safety precautions.  See Gravelin v. Satterfield, 200

3   Cal. App. 4th 1209, 1216 (2011).  "A hirer is also not

4   liable where a worker is injured because the contractor

5   'has failed to engage in inspections of the premises

6   implicitly or explicitly delegated to it.'"  Id. (quoting

7   Kinsman, 37 Cal. 4th at 677).

8

9   **B.  Judgment as a Matter of Law**

10

11      The Court finds that Ridgel's submitted evidence shows

12   that there are a number of genuine disputes of material

13   fact in this matter.  Thus, the evidence submitted by the

14   parties does not establish facts upon which the Court can

15   grant judgment as a matter of law under FRCP 56.

16

17      The Government argues that the evidence establishes

18   that a reasonable jury cannot find that (1) Ridgel was

19   injured by a concealed, hazardous condition; (2) Ridgel

20   was not aware of or could not reasonably ascertain the

21   condition of the pipe; and (3) the VA did not explicitly

22   warn Ridgel about the pipe.  The Court disagrees.

23

24      First, the Government argues that that the pipe was

25   not concealed, as "there was nothing concealed about the

26   fact that the pipe could emit steam" and Ridgel knew from

27   his revised work proposal that he would be doing work

28

1  regarding a "hot vent pipe."  (MSJ at 8.)  This argument
2  fails.  There are disputed facts as to whether Ridgel
3  knew the pipe was a steam pipe.  Even if Ridgel did know
4  this, the Government offers no explanation as to why a
5  non-concealed "hot vent pipe" or "steam pipe" would lead
6  to the conclusion that the pipe's "volcanic effect, where
7  [190-degree] water was gushing out every so often," would
8  not be a concealed, hazardous condition.  (Salazar Dep.
9  At 35:4-7.)  Further, the concealed, hazardous condition
10 may be more properly identified as the malfunctioning
11 liquid mover.  The evidence establishes or shows a
12 genuine dispute of facts as to (1) the VA's lack of
13 effort to repair the malfunctioning liquid mover before
14 Ridgel's injury; (2) Salazar's failure to mention the
15 malfunction to Hendon when telling him about what work
16 needed to be done; and (3) Salazar's failure to mention
17 the malfunction to Ridgel.  Therefore, there is
18 sufficient evidence on which a jury could reasonably find
19 that Ridgel was injured by a concealed, hazardous
20 condition.

21

22    In its Reply, the Government argues that Ridgel "has
23 failed to present any evidence to establish that [the VA]
24 was aware, or should have been aware, of an unsafe,
25 hazardous condition with respect to the liquid mover on
26 March 23, 2011."  (Reply at 2.)  The Government's
27 argument is unavailing.  Salazar investigated a reported
28

water leak and determined that a likely cause was a malfunctioning liquid mover in the basement that was causing the fourth-floor pipe to emit scalding water. Salazar also declares that when he took Ridgel to the third-floor roof, the pipe "was still regularly emitting scalding condensate on the fourth floor roof." (Salazar Decl. ¶ 7.) This constitutes evidence that the Government should have been aware that the liquid mover that was malfunctioning shortly before March 23, 2011, and which had not been repaired, would still be malfunctioning on March 23, 2011.

Second, the Government argues that Ridgel knew or could have ascertained the condition of the pipe. (MSJ at 9.) The factual disputes regarding what Salazar told Ridgel or whether Ridgel saw water emitting from the pipe when Salazar took him to the third-floor roof are the key issues of fact as to this element. Resolving these disputed facts and making credibility determinations regarding Ridgel and Salazar's statements are functions that must be performed by the jury, not the Court. See Anderson, 477 U.S. at 355; Aloe Vera of Am., Inc. v. United States of America, 699 F.3d 1153, 1165 (9th Cir. 2012). The Government contends that, despite these disputed facts as to Ridgel's knowledge, Ridgel would have ascertained the hazardous condition "had he taken even the most basic safety precautions." (MSJ at 9.)

The Government submits no admissible evidence though to show that Ridgel failed to take basic safety precautions. Nor does the Government establish that it was unreasonable for Ridgel not to inform Hendon or Salazar before he began his work, particularly in light of the evidence that Ridgel had performed work, including roof work, at the VA many times without going through or being asked to go through the notification procedures that the Government now describes as basic safety precautions. Further, the evidence shows that VA employees *did* know that Ridgel was beginning his work, as Hendon's subordinate, Walter Schmidt, and another VA employee helped Ridgel access the third-floor roof.  The Government also fails to support its defense that Ridgel failed to make a reasonable inquiry or inspection.  (Id. at 10.)  While Ridgel submits evidence that he did inspect the worksite on March 23, 2011 (Ridgel Decl. ¶¶ 23-24), it is unclear what inspection Ridgel could reasonably be expected to perform that would allow him to discover a malfunctioning liquid mover in the basement causing the emission of scalding liquid from the pipe to which he was hired to apply sealant.

Third, the Government's argument that Salazar "explicitly warned" Ridgel "about the hot steam vent pipe" has no merit as it is clearly premised on controverted facts, as described above.  (MSJ at 11.)

1

2    The Government also argues that Ridgel should be
3 "barred from suing for premises liability" because he
4 "was not qualified or licensed to perform the work he
5 contracted to do for the Long Beach VA."  (Reply at 7.)
6 In its MSJ, the Government identifies and defines
7 Ridgel's contractor license in the "Statement of Facts"
8 section and in the SUF.  (MSJ at 2-4; SUF ¶¶ 3-8.)  The
9 Government does not, however, make any arguments based on
10 the terms of Ridgel's license or even mention the license
11 or related facts in the "Argument" section of its MSJ.[3]
12 The Court therefore does not consider this argument, as
13 it is made by the Government for the first time in its
14 Reply.  See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir.
15 1999) ("[A]n argument raised for the first time in a
16 _reply_ brief . . . is not an argument that we may consider
17 here.") (emphasis in original); In re WellPoint, Inc.
18 Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002,
19 1047 (C.D. Cal. 2011).  The Court particularly notes here
20 that a party cannot preserve lines of argument by listing
21 relevant facts but then waiting until the Reply to make
22 any arguments or draw inferences based on those facts.
23 Cf. Smith, 194 F.3d at 1052 n.5 (stating a district court
24 is "under no obligation to take factual claims made by
25 the parties and fashion them into legal arguments");
26 Entertainment Research Group, Inc. v. Genesis Creative

27

28    [3] The Court notes that the Government had ample room
to include such an argument in its 10-page MSJ.

26

1    Group, Inc., 122 F.3d 1211, 1217 (9th Cir. 1997) ("We

2    will not manufacture arguments for an appellant, and a

3    bare assertion does not preserve a claim. . . .").

4

5       The Court therefore finds that there are multiple

6    genuine disputes of material fact established by the

7    evidence and that the Government is not entitled to

8    judgment as a matter of law.  The Court thus DENIES the

9    Government's Motion for Summary Judgment.

10

11

                        **IV.  CONCLUSION**

12

13      For the foregoing reasons, the Court DENIES the

14   United States of America's Motion for Summary Judgment.

15

16

17

18

19

20

21

22

23

Dated:  May 21, 2013            _____

24                                  Jesus G. Bernal

25                              United States District Judge

26

27

28

                              27